| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal Action No. 2016-0009** |
| | ) | |
| **OMY A. GUTIERREZ-CALDERON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

Attorneys:
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
**Everard E. Potter, Esq.,**
St. Thomas, U.S.V.I.
    *For the United States*

**Mark L. Milligan, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant Omy A. Gutierrez-Calderon*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Omy Gutierrez-Calderon's "Motion for Judgment of Acquittal" and his "Memorandum of Law in Support of his Renewed Motion for Judgment of Acquittal," both filed on July 21, 2017. (Dkt. Nos. 1071, 1072). The Government filed its "Response to Gutierrez's Renewed Rule 29 Motion" on August 4, 2017. (Dkt. No. 1092). For the reasons set forth below, the Court will deny Defendant Gutierrez-Calderon's Motion.

## I.    BACKGROUND

On May 10, 2016, the Grand Jury returned an Indictment against Defendant Gutierrez-Calderon and other individuals for various offenses relating to an alleged drug trafficking organization. The Grand Jury returned a Superseding Indictment on August 23, 2016, charging additional individuals. The Superseding Indictment states that Defendant Gutierrez-Calderon,

Defendant Sergio Quinones-Davila, and Defendant Jose Hodge "were the main leaders of a drug trafficking organization that operated in Florida, Puerto Rico, St. Croix and other parts of the Caribbean." (Dkt. No. 190 at 2). According to the Indictment, Defendant Gutierrez-Calderon or Defendant Quinones-Davila directed other coconspirators to "travel[] from Puerto Rico to St. Croix, and elsewhere, to participate in the mid-sea retrieval of drugs." *Id*. As against Defendant Gutierrez-Calderon, the Indictment charges one count of conspiracy to possess controlled substances with intent to distribute (Count 1); three counts of attempted possession of cocaine with intent to distribute (Counts 3, 5, and 6); and one count of possession of cocaine with intent to distribute (Count 7).

Jury selection began on May 2, 2017, opening statements began on May 15, 2017, testimony began on May 22, 2017, and the Government rested on June 22, 2017. After the Government rested, each of the six Defendants who proceeded to trial made a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The Court heard arguments on the motions for acquittal on June 22 and 23, 2017, and deferred its rulings thereon. On June 27, 2017, the Court, ruling from the bench, granted Defendant Gutierrez-Calderon's motion for judgment of acquittal on Counts 5 and Count 6, and denied it as to Counts 1, 3, and 7.[1] The trial concluded on July 7, 2017, after the jury was unable to reach a unanimous verdict. The Court declared a mistrial based on manifest necessity, and the jury was discharged.

Having prevailed on his motion for judgment of acquittal as to Counts 5 and 6, the instant Motion is directed to Counts 3, 5, and 7. As discussed below, the Motion will be denied.

---

[1] With regard to the other Defendants' motions for acquittal, the Court granted the motions on Count 2 as to Defendant Hodge and Count 5 as to Defendant Anibal Vega-Arizmendi, and denied the motions in all other respects.

## II. LEGAL STANDARDS

Rule 29 of the Federal Rules of Criminal Procedure provides that "the Court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Pursuant to Rule 29(c), a "defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). Rule 29 expressly provides that "[i]f the jury has failed to return a verdict, the court may enter a judgment of acquittal." *Id.* For a Rule 29 motion, a court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McIntyre*, 612 F. App'x 77, 78 (3d Cir. 2015) (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424-25 (3d Cir. 2013)) (quotations omitted) (emphasis in original); *see also United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) ("In reviewing a Fed. R. Crim. P. 29 post-verdict motion for judgment of acquittal, a district court must 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001))).

A defendant "challenging the sufficiency of the evidence bears a heavy burden," *United States v. Donna*, 366 F. App'x 441, 450 (3d Cir. 2010), and an insufficiency finding should be "confined to cases where the prosecution's failure is clear." *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). It is well-established that, on a Rule 29 motion, evidence should not be viewed in a vacuum but in relation to the totality of the evidence elicited in a case. *See United States v. Pavulak*, 700 F.3d 651, 668 (3d Cir. 2012) (noting that, in reviewing

a sufficiency of evidence claim, courts "examine the totality of the evidence, both direct and circumstantial" (quoting *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009))) (quotations omitted). Thus, "[t]he question is whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let a jury find him guilty beyond a reasonable doubt." *Caraballo-Rodriguez*, 726 F.3d at 432 (quoting *United States v. Cooper*, 567 F.2d 252, 254 (3d Cir. 1977)) (quotations omitted). It is "immaterial" that the evidence may permit a "less sinister conclusion" than one of guilt. *Smith*, 294 F.3d at 478 (quoting *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998)) (quotations omitted). In other words, "the evidence does not need to be inconsistent with every conclusion save that of guilt." *Id.* (quoting *Dent*, 149 F.3d at 188) (quotations omitted).

With regard to Count 1 of the Indictment—conspiracy to possess with intent to distribute more than five kilograms of cocaine—the Third Circuit Model Jury Instructions provide that the Government must prove the following three elements: (1) that two or more persons agreed to possess with the intent to distribute a controlled substance; (2) that the defendant was a party to or member of that agreement; and (3) that the defendant joined the agreement or conspiracy knowing of its objectives to possess with the intent to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose, and the intent to achieve that objective. Third Circuit Model Jury Instruction 6.21.846B.

While the Government must establish each element beyond a reasonable doubt, "[i]t may do so with direct or circumstantial evidence." *Caraballo-Rodriguez*, 726 F.3d at 425. "Indeed, the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence." *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). The Third

Circuit has noted that "[t]he existence of a conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants could not have been carried on except as the result of a preconceived scheme or common understanding." *United States v. Mark*, 533 F. App'x 83, 85 (3d Cir. 2013) (quoting *Brodie*, 403 F.3d at 134) (quotations and ellipses omitted). Nonetheless, "[c]ircumstantial inferences drawn from the evidence must bear a 'logical or convincing connection to established fact.'" *Caraballo-Rodriguez*, 726 F.3d at 425 (quoting *United States v. Cartwright*, 359 F.3d 281, 291 (3d Cir. 2004)).

As to Counts 3, 5, and 6 of the Indictment—attempted possession with the intent to distribute more than five kilograms of cocaine—the Government must prove: (1) that the defendant intended to commit the crime of possession of cocaine with intent to distribute; and (2) that the defendant performed an act constituting a substantial step toward the commission of possession of cocaine with intent to distribute which strongly corroborates or confirms that the defendant intended to commit that crime. Third Circuit Model Jury Instruction 7.01; *see also United States v. Earp*, 84 F. App'x 228, 232-34 (3d Cir 2004).

With regard to Count 7—and by implication Counts 3, 5, and 6—to prove the crime of possession with intent to distribute, the Government must prove that the defendant "(1) knowingly possessed [the] controlled substance with (2) the intent to distribute it." *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) (quoting *United States v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006)) (quotations omitted). Intent to distribute may be inferred from the quantity of the drug possessed by the defendant. *United States v. Rodriguez*, 961 F.2d 1089, 1092 (3d Cir. 1992) ("When a defendant is found in possession of a sufficiently large quantity of drugs, an intent to distribute may logically be inferred from the quantity of drugs alone.").

# III. ANALYSIS

## A. Evidence Adduced at Trial

The following evidence, pertinent to Defendant Gutierrez-Calderon's Motion, was elicited at trial. All of the evidence is based on the testimony of the witnesses and/or grounded in exhibits introduced by the Government.

On April 19, 2012, United States Customs and Border Protection Agent Gregory DeFelice stopped a vessel heading to St. Thomas. Six individuals, including Defendant Quinones-Davila and Ramon Lacen-Santiago were on the vessel. Also on the vessel was over $400,000 in cash, some of which Defendant Quinones-Davila claimed. Department of Homeland Security Special Agent Louis Penn testified that Defendant Quinones-Davila told him that he was coming to St. Thomas with friends to shop for jewelry and other items and that he would stay wherever his friends were staying.

Timothy Schoenbohm testified that around August 2014 he met Defendant Hodge and they began to plan a "job" in which they would use Schoenbohm's boat to meet with another boat south of St. Croix to collect a load of cocaine.[2] Schoenbohm learned that the job was for Defendant Quinones-Davila. Schoenbohm and Defendant Quinones-Davila exchanged texts prior to the job in which Defendant Quinones-Davila encouraged Schoenbohm and assured Schoenbohm of Defendant Quinones-Davila's belief that Schoenbohm was "good." Schoenbohm testified that he and Defendant Hodge went out to sea and successfully retrieved 35 kilograms of cocaine. Schoenbohm further testified that approximately a week after he and Defendant Hodge retrieved

---

[2] According to the evidence, Schoenbohm was initially a member of the alleged drug organization until November 13, 2014, when he agreed to become a Government confidential source after he was stopped by police following an unsuccessful attempt to retrieve drugs and was found to be in unlawful possession of a gun.

the cocaine, Defendant Quinones-Davila traveled to St. Croix and met with Defendant Hodge and Schoenbohm. At the meeting, Defendant Quinones-Davila shook Schoenbohm's hand, told him "good job," and that there was a lot more work to do.

According to Schoenbohm, in October 2014, Schoenbohm and Defendant Hodge began preparations for another job—this time for the retrieval of 71 kilograms of cocaine. Some of the cocaine was for Defendant Hodge and some was for Defendant Quinones-Davila. Defendant Hodge and Schoenbohm made the first trip out to sea to pick up the drugs, but they were unsuccessful. Later, Defendant Anibal Vega-Arizmendi, Defendant Hodge, and Jean Cruz made a second trip out to sea, which was also unsuccessful. On the third trip, Schoenbohm, Defendant Anibal Vega-Arizmendi, and Cruz went out to sea and successfully retrieved the drugs. Defendant Hodge stored the cocaine at his residence until Carmelo Cruz-Velez came to St. Croix to collect it. Cruz-Velez transported the 71 kilograms of cocaine to Puerto Rico by airplane.

Schoenbohm also testified that in early November 2014, Defendant Hodge contacted him about another job in which they would go 65 nautical miles south of St. Croix to retrieve approximately 80 kilograms of cocaine. About one week before Schoenbohm and Defendant Hodge attempted the job, Defendant Gutierrez-Calderon, Schoenbohm, Defendant Anibal Vega-Arizmendi, and Cruz were at a hotel together. While there, Defendant Gutierrez-Calderon gave Schoenbohm a gun so that Schoenbohm would have protection while he was out on the ocean retrieving drugs. Defendant Gutierrez-Calderon and Schoenbohm had talked earlier about "doing work" and Schoenbohm had said that he needed protection for when he retrieved drugs.

When Schoenbohm and Defendant Hodge ultimately went out to sea to try to retrieve the 80 kilograms of cocaine, they were unsuccessful. After Schoenbohm and Defendant Hodge returned to St. Croix, they were stopped by the police. The police searched Schoenbohm's vehicle

and found the gun. Schoenbohm testified that he had the gun when he went out with Defendant Hodge and that he was prepared to use the gun if necessary. The next day, Defendant Hodge indicated to Schoenbohm that he did not want to go out to sea to make another attempt that day and that they should relax for a week. Defendant Quinones-Davila called Schoenbohm and asked if he could go out by himself to make another attempt, but he refused.

Schoenbohm further testified as to another job that occurred in December 2014. Schoenbohm was on St. Thomas when Defendant Hodge contacted him about using Schoenbohm's boat to do a job. Defendant Hodge arranged to have Cruz and Gamalier Rohlsen pick up Schoenbohm in St. Thomas and transport him by boat to St. Croix. Once on St. Croix, Schoenbohm observed Defendant Anibal Vega-Arizmendi, Defendant Jean Carlos Vega-Arizmendi, Cruz, and Rohlsen at Chenay Bay. The morning after he arrived on St. Croix, Schoenbohm prepared his boat to go out to sea to retrieve 30 kilograms of cocaine. When Schoenbohm launched his boat, Cruz and Defendant Anibal Vega-Arizmendi left with the boat and later returned to Chenay Bay. Although Schoenbohm had to go back to St. Thomas, Defendant Gutierrez-Calderon asked Schoenbohm to use Schoenbohm's boat to make another attempt to retrieve drugs, and Schoenbohm agreed. Defendant Gutierrez-Calderon discussed paying Schoenbohm $15,000 for the use of his boat. Schoenbohm later learned from Rohlsen that 30 kilograms of cocaine were picked up with Schoenbohm's boat and were transported to Culebra.

According to Schoenbohm, in late April or early May 2015, Defendant Hodge and Schoenbohm discussed an upcoming job to retrieve drugs. Defendant Hodge indicated that he would use either Defendant Anibal Vega-Arizmendi or Cruz for the job. In May 2015, Schoenbohm and Drug Enforcement Administration ("DEA") Special Agent Jeremy Latchman observed a boat known as the Mako flipped over at Chenay Bay. Schoenbohm also observed

Defendant Gutierrez-Calderon, Defendant Hodge, and Defendant Anibal Vega-Arizmendi present at Chenay Bay. Defendant Anibal Vega-Arizmendi was trying to flip the Mako back over, and Defendant Gutierrez-Calderon told Schoenbohm, "Look, we have mucho problems."

The Government introduced audio recorded conversations that took place between Schoenbohm and Defendant Quinones-Davila in November 2015 in which Defendant Quinones-Davila asked Schoenbohm whether his boat was ready and told him not to go anywhere. Soon thereafter, Defendant Hodge called Schoenbohm and told Schoenbohm to meet him and others at the Pueblo Supermarket parking lot. After Defendant Hodge called Schoenbohm, Defendant Quinones-Davila called Schoenbohm and asked "I surprise you – eh?" Schoenbohm testified that he was, in fact, surprised because the other people Defendant Hodge wanted him to meet at Pueblo Supermarket had suddenly showed up in St. Croix from Puerto Rico. When Schoenbohm went to the parking lot, he saw Defendant Hodge, Defendant Anibal Vega-Arizmendi, and Cruz. Schoenbohm learned that that they were doing a job for Defendant Quinones-Davila, but Schoenbohm was instructed not to tell Defendant Hodge that the job was for Defendant Quinones-Davila.

Schoenbohm, Defendant Anibal Vega-Arizmendi, Cruz, and an individual identified as Juan later went out on the first of several attempts to obtain drugs, but because of rough seas they returned without retrieving the drugs. Afterwards, Schoenbohm, Defendant Hodge, Defendant Anibal Vega-Arizmendi, Cruz, and others were at a hotel where they discussed making a second attempt, and Defendant Hodge assured Schoenbohm that an individual identified as Danny was a good captain and could drive Schoenbohm's boat. The next day, Schoenbohm launched his boat and let others take it on another attempt, but the attempt was again unsuccessful. Schoenbohm testified that Danny, Juan, and Defendant Anibal Vega-Arizmendi later used a green Spider boat

on another unsuccessful attempt. As to this attempt, the Government introduced video surveillance of the Spider allegedly returning from the unsuccessful attempt and Defendant Anibal Vega-Arizmendi getting out of the boat and climbing into Schoenbohm's pickup truck at Great Pond on St. Croix.

The Government introduced evidence that Defendant Gutierrez-Calderon sent money to Schoenbohm on November 12, 2015, via Western Union so that Schoenbohm could fuel his boat for another attempt to retrieve drugs. Specifically, the Government introduced an audio recording allegedly between Schoenbohm and Defendant Gutierrez-Calderon in which Schoenbohm is giving Defendant Gutierrez-Calderon his contact information so that Defendant Gutierrez-Calderon could send Schoenbohm money through Western Union. The Government also introduced three Western Union receipts dated November 12, 2015, which Schoenbohm testified represent the payments he received for the gas.

The next day, on November 13, 2015, Schoenbohm met Defendant Hodge, Defendant Burgos-Montanez, Rohlsen, and Danny on a beach where Rohlsen, Danny, and Defendant Burgos-Montanez boarded Schoenbohm's boat and headed east. Schoenbohm and Defendant Hodge got into a minivan and drove away. DEA Task Force Officer ("TFO") Aldemar Santos testified that at about 2:00 a.m. the next morning, he arrived at Knight's Bay and saw Defendant Hodge being detained by another officer. TFO Santos walked along the beach with his flashlight and observed Rohlsen, Defendant Burgos-Montanez, and an unidentified male conversing with each other. When TFO Santos announced "police," two of the three men ran. Law enforcement officers were able to detain two men and discovered four suitcases nearby. It was later determined that the suitcases collectively contained 87 kilograms of cocaine. Later that same morning, TFO Santos observed a man walking along the road and recognized him as the third male who had been on the

beach earlier that morning. TFO Santos apprehended the man and later identified him as Defendant Burgos-Montanez.

After the arrest of Defendant Hodge, Defendant Burgos-Montanez, and Rohlsen, Defendant Quinones-Davila had a conversation with Schoenbohm. During the conversation, Defendant Quinones-Davila inquired about the whereabouts of Danny and told Schoenbohm that Schoenbohm's and Danny's names were being called. Schoenbohm understood this to mean that the individuals in jail were accusing him and Danny of setting them up.

After several other alleged coconspirators were arrested, Defendant Gutierrez-Calderon contacted Deputy United States Marshal ("DUSM") Felix Carrion and told him that he was broke, tired of running, and wanted to self-surrender. Defendant Gutierrez-Calderon also allegedly stated that he wanted to cooperate and informed DUSM Carrion that, if the DEA gave him $150,000, he could purchase a load of drugs from an individual in Venezuela named Georgie.

**B.     Count 3**

Count 3 charges that between November 10, 2014 and November 12, 2014, Defendant Gutierrez-Calderon and others, while aiding and abetting each other, did knowingly and intentionally attempt to possess, with intent to distribute more than five kilograms of a mixture and substance containing a detectible amount of cocaine hydrochloride. (Dkt. No. 190 at 12). The Court finds that the Government introduced sufficient evidence for a rational juror to find Defendant Gutierrez-Calderon guilty of Count 3 beyond a reasonable.

To meet its burden of proof on Count 3 as to aiding and abetting, the Government was required to prove the following four elements beyond a reasonable doubt: (1) that someone committed each of the essential elements of the charged offense (attempted possession of cocaine with intent to distribute); (2) that Defendant Gutierrez-Calderon knew that the charged offense was

going to be committed; (3) that Defendant Gutierrez-Calderon knowingly did some act for the purpose of aiding, assisting, facilitating or encouraging the commission of the charged offense and with the intent that the charged offense be committed; and (4) that Defendant Gutierrez-Calderon's act or acts did, in some way, aid, assist, facilitate or encourage the commission of the crime. As noted above, to meet its burden of proof regarding attempted possession of cocaine with attempt to distribute, the Government was required to prove the following two elements: (1) that someone intended to commit the crime of possession of more than five kilograms of cocaine with intent to distribute; and (2) that someone performed an act constituting a substantial step toward the commission of possession of cocaine with intent to distribute which strongly corroborates or confirms that the person intended to commit that crime. Third Circuit Model Jury Instruction 7.01; *see also United States v. Earp*, 84 F. App'x at 232-34.

As relevant for Count 3, Schoenbohm testified that he and Defendant Hodge went out to sea in Schoenbohm's boat in an attempt to retrieve approximately 80 kilograms of cocaine. This evidence is sufficient for the Government to meet its burden of proof that Defendant Hodge and Schoenbohm attempted to possess cocaine with the intent to distribute. As for evidence from which a rational juror could conclude beyond a reasonable doubt that Defendant Gutierrez-Calderon knew that the offense of attempted possession of cocaine with intent to distribute was going to be committed, Schoenbohm testified that about a week before he and Defendant Hodge attempted the job, Defendant Gutierrez-Calderon gave him a gun. Schoenbohm further testified that he and Defendant Gutierrez-Calderon had talked earlier about "doing work;" that Schoenbohm had told Defendant Gutierrez-Calderon that he needed protection for when he retrieved drugs; and that Defendant Gutierrez-Calderon gave him a gun so that Schoenbohm would have protection while he was out on the ocean retrieving drugs.  A rational juror could also find beyond a reasonable

doubt that this evidence shows that Defendant Gutierrez-Calderon knowingly did some act—specifically, providing Schoenbohm with a gun—for the purpose of aiding, assisting, facilitating or encouraging the commission of the charged offense and with the intent that the charged offense be committed. Additionally, Schoenbohm testified that he had the gun that Defendant Gutierrez-Calderon gave him when he went out with Defendant Hodge, and that he was prepared to use the gun if necessary.

In his Motion, Defendant Gutierrez-Calderon argues that the Government failed to present sufficient evidence to prove that Defendant Gutierrez-Calderon's alleged act of providing Schoenbohm the gun in some way aided, facilitated, or encouraged the commission of the crime. (Dkt. No. 1072 at 5). Defendant Gutierrez-Calderon specifically asserts that there was no evidence showing that "the firearm was ever used that night," or that the firearm "'factored,' in any way, in the perpetration of the illegal attempt." *Id.* The Court finds these arguments to be unavailing.

Viewing the evidence in the light most favorable to the Government, the Court finds that a rational juror could reasonably find that Defendant Gutierrez-Calderon encouraged the attempt by providing Schoenbohm with the gun. Schoenbohm testified that he had told Defendant Gutierrez-Calderon that he needed protection for when he retrieves drugs, and that the gun Defendant Gutierrez-Calderon gave him was meant to be that protection. Regardless of whether Schoenbohm ever used the gun, a rational jury could reasonably infer that by possessing it Schoenbohm felt more protected and thus was more willing to attempt the mid-sea retrieval of drugs.

Accordingly, the Court finds that the Government submitted sufficient evidence from which a rational juror could conclude beyond a reasonable doubt that Defendant Gutierrez-Calderon aided and abetted the attempted possession of cocaine with the intent to distribute as

charged in Count 3 of the Indictment. Defendant Gutierrez-Calderon's Rule 29 Motion as to Count 3 of the Indictment will therefore be denied.

### C. Count 7

Count 7 charges that on or about November 14, 2015, Defendant Gutierrez-Calderon and others, while aiding and abetting each other, did knowingly and intentionally possess, with intent to distribute, more than five kilograms of a mixture and substance containing a detectible amount of cocaine hydrochloride. (Dkt. No. 190 at 15). The Court finds that the Government introduced sufficient evidence from which a rational juror could find Defendant Gutierrez-Calderon guilty of Count 7 beyond a reasonable doubt.

To meet its burden of proof regarding Count 7, the Government was required to prove the same elements as noted above for Count 3, except that the charged offense here is possession—rather than attempted possession—of cocaine with intent to distribute. Possession of cocaine with intent to distribute requires proof of a knowing possession of the controlled substance with the intent to distribute it.

The Government introduced sufficient evidence to meet its burden of proof that someone committed the crime of possession of cocaine with an intent to distribute. Specifically, there was evidence that the coconspirators were attempting to do a "job," which is code for a retrieval of cocaine; that on the night of November 13 Defendant Burgos-Montanez and others departed on Schoenbohm's boat, which the coconspirators had used on several earlier occasions to retrieve or attempt to retrieve cocaine; and that in the early morning of November 14, Defendant Burgos-Montanez and others were found on a beach in close proximity to four suitcases that collectively contained 87 kilograms of cocaine.

The Government also introduced evidence that Defendant Gutierrez-Calderon knew that the charged offense was going to be committed and that he knowingly did some act for the purpose of aiding or facilitating the commission of the charged offense and with the intent that the charged offense be committed. Schoenbohm testified that the intended purpose of the money that Defendant Gutierrez-Calderon sent to him via Western Union was to purchase gas so that his boat could go out to sea to retrieve drugs, and the Western Union receipts were offered as evidence that Schoenbohm received the money the day before the November 13 attempt. From this, a rational juror could reasonably infer that Defendant Gutierrez-Calderon sent the money to Schoenbohm because he knew that the coconspirators were planning another attempt to retrieve the cocaine and would need money to purchase fuel for Schoenbohm's boat. Likewise, a rational juror could reasonably infer that Defendant Gutierrez-Calderon intended that the Western Union money would be used to effectuate the attempt.

Finally, the Government also introduced evidence to show that Defendant Gutierrez-Calderon's act of sending money to Schoenbohm actually facilitated the commission of the crime. Schoenbohm testified that after receiving the money from Western Union, he filled up his boat with gas, and the boat was used to try to retrieve the cocaine.

In his Motion, Defendant Gutierrez-Calderon first argues that the Government failed to meet its burden of showing that Defendant Gutierrez-Calderon actually sent money via Western Union and also failed to meet its burden of showing that the money Schoenbohm received was actually used to purchase the gas that was used to retrieve the cocaine. (Dkt. No. 1072 at 6). The Court disagrees with Defendant Gutierrez-Calderon's assertions in this regard.

As noted above, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt." *McIntyre*, 612 F. App'x at 78 (quoting *Caraballo-Rodriguez*, 726 F.3d at 424-25) (quotations omitted) (emphasis in original). At trial, the Government introduced an audio recording allegedly between Schoenbohm and Defendant Gutierrez-Calderon in which Schoenbohm is giving Defendant Gutierrez-Calderon his contact information so that Defendant Gutierrez-Calderon could send Schoenbohm money through Western Union. In the audio recording, Defendant Gutierrez-Calderon instructs Schoenbohm to go to Western Union right away. The Government also introduced three Western Union receipts dated November 12, 2015, in connection with the payments Schoenbohm testified he received. Given the applicable legal standard, this is sufficient evidence from which a rational juror could find that Defendant Gutierrez-Calderon sent Schoenbohm the money.

Further, Schoenbohm testified that he used the money to purchase gas for his boat before the boat went out to sea to retrieve the drugs. The Western Union receipts were dated November 12, and the boat went out to sea on November 13. On the early morning of November 14, the coconspirators were encountered on the beach at Knight's Bay with 87 kilograms of cocaine in close proximity. Given the applicable legal standard, the above evidence is sufficient for a rational juror to conclude beyond a reasonable doubt that Defendant Gutierrez-Calderon sent money to Schoenbohm and that the money was used to purchase the gas that was needed for the successful retrieval of the cocaine.

Defendant Gutierrez-Calderon also argues that the Government failed to prove that any Defendant actually or constructively possessed the 87 kilograms of cocaine. (Dkt. No. 1072 at 6). This argument also fails in light of the evidence and applicable legal standard.

"To 'possess' a controlled substance means to have it within a person's control." Third Circuit Model Jury Instruction 6.21.846B. Possession occurs when one physically holds the

controlled substance (actual possession) or when one has the power and intention to exercise control over it (constructive possession). *Id.*; *see also United States v. Benjamin*, 711 F.3d 371, 376 (3d Cir. 2013) ("Constructive possession occurs when '[a] person who, although not in actual possession, knowingly has both the *power and the intention* at a given time to exercise dominion or control over a thing, either directly or through another person or persons.'" (quoting *United States v. Garth*, 188 F.3d 99, 112 (3d Cir. 1999))) (emphasis in original).

Here, the Government introduced evidence of a plan among the coconspirators to use Schoenbohm's boat to retrieve a load of cocaine. Then, after Rohlsen, Defendant Burgos-Montanez, and Danny departed with Schoenbohm's boat on November 13, 2015, law enforcement officers observed Rohlsen, Defendant Burgos-Montanez and an unidentified individual standing on the beach in the dark conversing with each other early the next morning. Nearby on the beach, the officers found four suitcases with 87 kilograms of cocaine. This is circumstantial evidence from which a rational juror could conclude that at some time after the coconspirators departed with Schoenbohm's boat, they obtained the 87 kilograms of cocaine; brought it back to St. Croix; and, upon arriving at St. Croix, transported the drugs from Schoenbohm's boat to the beach. Thus, the Government put forth sufficient evidence that the coconspirators on Schoenbohm's boat actually possessed the cocaine when they transported it back to St. Croix and when they transported it from the boat to the beach.

Based on the evidence presented, a rational juror could also conclude that the three individuals on the beach constructively possessed the cocaine. In light of the coconspirator's plan to retrieve cocaine and the fact that the three individuals were on a beach at 2:00 a.m. standing in close proximity to the cocaine, a rational juror could find that the three individuals had the power and intention to exercise control over the cocaine.

Accordingly, the Court finds that the Government submitted sufficient evidence from which a rational juror could conclude beyond a reasonable doubt that Defendant Gutierrez-Calderon aided and abetted the possession of cocaine with the intent to distribute as charged in Count 7 of the Indictment. Defendant Gutierrez-Calderon's Rule 29 Motion as to Count 7 of the Indictment will therefore be denied.

### D.     Count 1

Count 1 charges that from on or about January 2012 until on or about December 2015, Defendant Gutierrez-Calderon and others did conspire and agree with one another to knowingly and intentionally possess, with intent to distribute, more than five kilograms of cocaine. The Court finds that the Government introduced sufficient evidence for a rational juror to find Defendant Gutierrez-Calderon guilty of Count 1 beyond a reasonable doubt.

To meet its burden of proof regarding Count 1, the Government was required to prove beyond a reasonable doubt the following three elements: (1) that two or more persons agreed to possess cocaine or marijuana with the intent to distribute it; (2) that Defendant Gutierrez-Calderon was a party to or a member of that agreement; and (3) that Defendant Gutierrez-Calderon joined the agreement or conspiracy knowing of its objective to possess cocaine or marijuana with the intent to distribute it and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that Defendant Gutierrez-Calderon and at least one other alleged conspirator shared a unity of purpose and the intent to achieve the objective. *See* Third Circuit Model Jury Instruction 6.21.846B.

The Court finds that the Government introduced sufficient evidence from which a rational juror could conclude that Defendant Gutierrez-Calderon conspired with others to possess more than five kilograms of cocaine with intent to distribute. As noted above, there is sufficient evidence

from which a rational juror could conclude that Defendant Gutierrez-Calderon aided and abetted the November 2014 attempt to retrieve 80 kilograms of cocaine by providing Schoenbohm with a gun (Count 3), and the November 2015 retrieval of 87 kilograms of cocaine by providing money for gas (Count 7). Moreover, there is evidence from which a rational juror could conclude that Defendant Hodge participated in Count 3 (by going out onto the ocean with Schoenbohm in an attempt to retrieve the drugs), as well as Count 7 (by being present when Schoenbohm's boat was launched on November 13, 2015, and by being present at Knight's Bay in the early hours of the next morning when coconspirators were discovered with 87 kilograms of cocaine nearby). Likewise for Defendant Quinones-Davila, there is evidence from which a rational juror could find that he participated in Count 3 (by asking Schoenbohm to make another retrieval attempt by himself after Defendant Hodge refused to go) and Count 7 (by communicating with Schoenbohm to ensure that Schoenbohm's boat was ready and available and by the evidence that the job was for Defendant Quinones-Davila).

In addition, there is evidence from which a rational juror could find that Defendant Gutierrez-Calderon was involved in the December 2014 retrieval of 30 kilograms of cocaine. Schoenbohm testified that Defendant Gutierrez-Calderon asked to continue using Schoenbohm's boat after Schoenbohm had to return to St. Thomas. Schoenbohm agreed to let the coconspirators continue using his boat, and Defendant Gutierrez-Calderon discussed paying Schoenbohm $15,000 for the use of his boat. Finally, there is also evidence that after several other alleged coconspirators were arrested, Defendant Gutierrez-Calderon contacted DUSM Carrion and told him that he was broke, tired of running, and wanted to self-surrender. Defendant Gutierrez-Calderon also indicated that he wanted to cooperate and informed DUSM Carrion that if the DEA

gave him $150,000, he could purchase a load of drugs from an individual in Venezuela named Georgie.

Based on this evidence, a rational juror could find beyond a reasonable doubt that Defendant Hodge, Defendant Quinones-Davila, Defendant Gutierrez-Calderon, and others knowingly and intentionally arrived at a mutual understanding to work together to possess more than five kilograms of cocaine with the intent to distribute it. While there is no direct evidence of a formal agreement to engage in cocaine trafficking, there is sufficient evidence that multiple people worked together so that boats from St. Croix would meet with other vessels south of St. Croix to retrieve cocaine. Indeed, Schoenbohm testified that Defendant Gutierrez-Calderon facilitated such trips by providing Schoenbohm with a gun; asking Schoenbohm to use his boat for an attempt and discussing paying Schoenbohm $15,000; and sending money for gas to Schoenbohm via Western Union. Based on the circumstances surrounding the scheme and the actions of Defendant Gutierrez-Calderon and other coconspirators, a rational jury could find beyond a reasonable doubt that a conspiracy existed and that Defendant Gutierrez-Calderon was one of its members. *Brodie*, 403 F.3d at 134 ("[T]he existence of a conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants could not have been carried on except as the result of a preconceived scheme or common understanding.") (quoting *Smith*, 294 F.3d at 477) (quotations and ellipses omitted).

There is also sufficient evidence from which a rational juror could find that Defendant Gutierrez-Calderon joined in the conspiracy knowing of its criminal objective and intending to join together with at least one other alleged conspirator to achieve that objective. In this regard, there is evidence that about one week before Defendant Hodge and Schoenbohm made the

November 2014 attempt to retrieve 80 kilograms of cocaine, Defendant Gutierrez-Calderon, Schoenbohm, Cruz, and Defendant Anibal Vega-Arizmendi were at a hotel together. Earlier, Schoenbohm, Cruz, and Defendant Anibal Vega-Arizmendi had successfully retrieved 71 kilograms of cocaine during an October 2014 trip. Schoenbohm testified that while at the hotel, Defendant Gutierrez-Calderon gave Schoenbohm a gun so that he would have protection while he was out on the ocean retrieving drugs. Defendant Gutierrez-Calderon and Schoenbohm had talked earlier about "doing work," and Schoenbohm had said that he needed protection for when he picks up drugs. Also noteworthy is Schoenbohm's testimony that—after an unsuccessful attempt to retrieve a load of cocaine in December 2014—Defendant Gutierrez-Calderon discussed paying Schoenbohm $15,000 to use Schoenbohm's boat to make another attempt to retrieve drugs, and Schoenbohm agreed. Schoenbohm later learned from Rohlsen that 30 kilograms of cocaine were picked up with Schoenbohm's boat and were transported to Culebra. Finally, there is also evidence of statements by Defendant Gutierrez-Calderon to DUSM Carrion indicating that he wanted to cooperate and could purchase a load of cocaine from a Venezuelan source if the DEA gave him $150,000.

Viewing the evidence in the light most favorable to the prosecution, this evidence supports the reasonable inference that when Defendant Gutierrez-Calderon and Schoenbohm had talked about "doing work," Defendant Gutierrez-Calderon had learned about the conspiracy's criminal objective of retrieving loads of cocaine. The inference that Defendant Gutierrez-Calderon knew of the conspiracy's criminal objective is further supported by his discussions with Schoenbohm to use Schoenbohm's boat in exchange for paying Schoenbohm $15,000 and the fact that the coconspirators successfully retrieved 30 kilograms of cocaine with Schoenbohm's boat. In addition, Defendant Gutierrez-Calderon's own statements to DUSM Carrion that he had a contact

in Venezuela from whom he could purchase cocaine also support the inference that Defendant Gutierrez-Calderon knew of the conspiracy's objective. Finally, the evidence that Defendant Gutierrez-Calderon gave Schoenbohm a gun for protection and later asked Schoenbohm to use his boat to make another attempt to retrieve drugs, is evidence that Defendant Gutierrez-Calderon intended to join in the conspiracy and to help achieve its objective of retrieving cocaine.[3]

In his Motion, Defendant Gutierrez-Calderon also asserts that "the evidence presented no set of facts, from which it may be reasonably inferred that a *single* agreement existed." (Dkt. No. 1072 at 3 (emphasis in original)). Instead, Defendant Gutierrez-Calderon argues that the evidence suggests that the various attempts to retrieve cocaine actually constitute "separate and independent conspiracies," and that there was no evidence showing that the various attempts "resulted from one continuing purpose, which could be treated as an ongoing, or continuing and continuing from [sic] the initial agreement, as alleged." *Id*. at 4. The Court disagrees.

When evaluating whether a series of events constitutes a single conspiracy or separate unrelated events, the Third Circuit looks at the following three factors set forth in *United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989):

> First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. Third, we examine the extent to which the participants overlap in the various dealings.

---

[3] In his Motion, Defendant Gutierrez-Calderon argues that "there is no proof, in the record, from which a rational jury could find that Defendant Gutierrez-Calderon was a 'leader' of the alleged master conspiracy, or that he participated, in that single conspiracy with the requisite knowledge and intent to violate the law." (Dkt. No. 1072 at 4). The Court first notes that the Government need not prove that Defendant Gutierrez-Calderon was one of the conspiracy's leaders in order to prove him guilty of conspiracy as charged in Count 1. In addition, as discussed above, there was sufficient evidence under the applicable legal standard for a rational juror to find beyond a reasonable doubt that Defendant Gutierrez-Calderon knowingly participated in the conspiracy with the intent to help achieve its criminal objective of retrieving cocaine.

*Kelly*, 892 F.2d at 259. While these three *Kelly* factors are "useful to show the existence of a single conspiracy . . . the absence of one factor does not necessarily defeat an inference of the existence of a single conspiracy." *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992).

When interpreting the first *Kelly* factor, courts do not restrict the meaning of "common goal" to a particular drug transaction. For example, the Third Circuit in *Kelly* held that "the common goal of all the participants was simply to make money selling 'speed'" and that "[a]lthough the various personnel changed during the period from 1983 to 1987, the central purpose was constant and pervasive." *Kelly*, 892 F.2d at 259. In finding that a single conspiracy existed, the Third Circuit in *Kelly* noted that even a "finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies." *Id.* at 258 (quoting *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986)) (quotations omitted); *see also United States v. Fausnaught*, 380 F. App'x 198, 201 (3d Cir. 2010) (noting that "the common goal among Fausnaught, Sechler, and their coconspirators was to make money from selling drugs[, and that] [t]his was a goal that Fausnaught, Sechler, and others pursued through coordinated efforts from prior to 1995 through 2003").

Here, there is ample evidence on the record from which a rational juror could find beyond a reasonable doubt that the common goal or objective among Defendant Gutierrez-Calderon and other coconspirators was to acquire illegal drugs and distribute them for financial gain. There is evidence that Defendant Hodge, Defendant Quinones-Davila, Schoenbohm, and others worked together to successfully retrieve cocaine in August 2014 and October 2014. As discussed above, there is also evidence that Defendant Gutierrez-Calderon aided and abetted in a November 2014 attempt to pick up cocaine by giving Schoenbohm a gun for protection and was involved in a December 2014 retrieval of 30 kilograms of cocaine by negotiating with Schoenbohm for the use

of his boat. Finally, there is evidence that in November 2015, Defendant Hodge, Defendant Quinones-Davila, Defendant Gutierrez-Calderon, Defendant Anibal Vega-Arizmendi, Defendant Burgos-Montanez, and others worked together to retrieve 87 kilograms of cocaine. This evidence, *inter alia*, shows that the central purpose of the conspiracy to acquire illegal drugs and distribute them for financial gain "was constant and pervasive." *Kelly*, 892 F.2d at 259. This is so notwithstanding that there might be evidence of sub-schemes within the master conspiracy and that the same individuals were not involved in every attempt. Thus, there is sufficient evidence to support a finding that the first *Kelly* factor has been satisfied.

The Court reaches the same conclusion regarding the second *Kelly* factor—whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. When interpreting the second *Kelly* factor, the Third Circuit "look[s] to whether there was evidence that the activities of one group were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *United States v. Rigas*, 605 F.3d 194, 214–15 (3d Cir. 2010) (quoting *United States v. Greenidge*, 495 F.3d 85, 93 (3d Cir. 2007)) (quotations omitted). In *United States v. Fausnaught*, 380 F. App'x 198 (3d Cir. 2010), the Court found that the second *Kelly* factor favored finding a single conspiracy where there was "substantial evidence of activities by members of the conspiracy that were necessary to further its overall purpose of making money through the sale of drugs. . . . [including,] the transportation of drugs; the supply, distribution and sale of the drugs; storage of the drugs at the residences of members of the conspiracy; and travel to Amsterdam to obtain materials for the growing of marijuana." *Fausnaught*, 380 F. App'x at 202.

Here, as in *Fausnaught*, there is substantial evidence that the activities of Defendant Gutierrez-Calderon and other conspirators were necessary or advantageous to the success of the

overall purpose of the conspiracy—to acquire illegal drugs and distribute them for financial gain. Most members of the conspiracy participated at some point in the transportation of drugs via boat or airplane for purposes of retrieval or sale, and there is evidence that Defendant Hodge at least on one occasion stored cocaine at his residence. There is also evidence that members of the conspiracy, including Defendant Quinones-Davila and Defendant Hodge, arranged to have individuals and resources (e.g., Schoenbohm's boat) available to accomplish jobs and coordinated at least one meeting among the individuals. In addition, Defendant Gutierrez-Calderon paid Schoenbohm money via Western Union to allow him to buy gas for his boat; gave Schoenbohm a gun for protection while retrieving drugs; and arranged for the continued use of Schoenbohm's boat for the December 2014 retrieval. Because this evidence shows activities of the coconspirators, including Defendant Gutierrez-Calderon, that were necessary or advantageous to the overall purpose of the conspiracy, there is sufficient evidence to support a finding that the second *Kelly* factor was satisfied.[4]

---

[4] While there is evidence that Defendant Hodge and Defendant Quinones-Davila at some point had a falling out, this does not mean that a rational juror could not find the existence of a single conspiracy. As the Third Circuit noted in *Kelly* when examining the second factor, a change in membership and structure of the conspiracy does not require a finding of multiple conspiracies: "A single conspiracy is not transformed into a series of unrelated, multiple conspiracies merely through a change in its membership. While Forte was cut out; DiTullio was double-crossed; and Vento, Jr. was shot, the conspiracy survived, Darwinian fashion, and continued to operate." *Kelly*, 892 F.2d at 259 (internal citations omitted). Here, there is evidence regarding the coconspirators' efforts in November 2015 which shows that the actions of both Defendant Quinones-Davila and Defendant Hodge were advantageous to the success of the overall purpose of the conspiracy. There is evidence that Defendant Quinones-Davila and Defendant Hodge both played a part in coordinating the efforts that led to the retrieval of 87 kilograms of cocaine. For example, Defendant Hodge assured Schoenbohm that Danny could pilot Schoenbohm's boat, and Defendant Hodge was present on the beach in the early morning near where coconspirators were in close proximity to 87 kilograms of cocaine. Defendant Quinones-Davila talked with Schoenbohm to ensure that Schoenbohm's boat was ready and available for the job involving the 87 kilograms of cocaine, and Schoenbohm later learned that the job was for Defendant Quinones-Davila.

As to the third *Kelly* factor—the extent to which the participants overlap in the various dealings—the Court again finds that there is sufficient evidence to support a finding that this factor is satisfied. In the context of the third *Kelly* factor, courts have noted that "it is not necessary for the government to prove 'each defendant knew all the details, goals, or other participants in order to find a single conspiracy.'" *United States v. Ha Ngo*, 451 F. App'x 220, 224 (3d Cir. 2011) (quoting *Kelly*, 892 F.2d at 260); *see also United States v. Perez*, 280 F.3d 318, 346-48 (3d Cir 2002) ("To establish a single conspiracy, the prosecutor need not prove that each defendant knew all the details, goals or other participants.") (quoting *Padilla*, 982 F.2d at 114) (quotations omitted).

In *Padilla*, the jury found Padilla and his co-defendants—who had all purchased large quantities of cocaine from Aguilar—guilty of conspiracy to distribute and possess with intent to distribute cocaine. *Padilla*, 982 F.2d at 112. Padilla argued that the Government failed to show that he was part of a single conspiracy in part because "his only connection to the conspiracy shown by the government was through Aguilar, the central figure." *Id.* at 115. The Third Circuit rejected this argument, noting the following:

> [A] single conspiracy can involve one pivotal figure who directs illegal activities while various combinations of other defendants further those activities in different ways and at different times. A single conspiracy finding does not require every member to participate in every transaction.

*Id.* (quoting *United States v. DeVarona*, 872 F.2d 119 (5th Cir. 1989)) (quotations omitted). Based in part on Padilla's overlap with Aguilar, the Third Circuit upheld the conspiracy conviction. *Id.*

Compared to the overlap in *Padilla*, there is evidence of a much greater degree of overlap between coconspirators in this case. For example, Defendant Hodge, Defendant Quinones-Davila, and Schoenbohm all worked together on the jobs to retrieve or attempt to retrieve loads of cocaine

in August 2014, October 2014, and November 2014.[5] Moreover, the October 2014 job involved Defendant Anibal Vega-Arizmendi who, together with Defendant Hodge and others, was involved in jobs that occurred in December 2014 and November 2015. As set forth above, Defendant Gutierrez-Calderon was involved with jobs that occurred in November 2014, December 2014, and November 2015. In addition, for the last job that occurred in November 2015, several coconspirators all worked together, including Defendant Hodge, Defendant Quinones-Davila, Defendant Gutierrez-Calderon, Defendant Anibal Vega-Arizmendi, Defendant Burgos-Montanez, Danny, Cruz, and Rohlsen. The above evidence shows significant overlap among the coconspirators—including Defendant Gutierrez-Calderon—stretching throughout the various jobs. Accordingly, there is sufficient evidence to support such a finding with regard to the third *Kelly* factor.

In view of the foregoing, the Court finds that there is sufficient evidence for a rational juror to find a single conspiracy beyond a reasonable doubt. For this and the other reasons articulated herein, the Court further finds that the Government introduced sufficient evidence from which a rational juror could find beyond a reasonable doubt that Defendant Gutierrez-Calderon is guilty of Count 1. Accordingly, Defendant Gutierrez-Calderon's Rule 29 Motion as to Count 1 of the Indictment will be denied.

## IV.    CONCLUSION

In sum, the Court finds that, viewing the totality of the evidence presented during trial in the light most favorable to the Government, a rational trier of fact could have found Defendant

---

[5] These jobs occurred prior to when Schoenbohm became a confidential source.

Gutierrez-Calderon guilty beyond a reasonable doubt as to Counts 1, 3, and 7. Thus, Defendant

Gutierrez-Calderon's Motion for Judgment of Acquittal will be denied.

An appropriate Order accompanies this Memorandum Opinion.

Date:  December 5, 2017

_____/s/_____
WILMA A. LEWIS
Chief Judge