## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| **UNITED STATES OF AMERICA** )<br>)<br>**v.** )<br>)<br>**OMY A. GUTIERREZ-CALDERON, et al.,** )<br>)<br>**Defendants.** )<br>_____) | **Criminal Action No. 2016-0009** |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Mark L. Milligan, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant Omy A. Gutierrez-Calderon*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Omy Gutierrez-Calderon's ("Defendant" or "Defendant Gutierrez-Calderon") Motion for a New Trial and Memorandum in Support (Dkt. Nos. 1734, 1735) and the Government's Opposition thereto (Dkt. No. 1751). An evidentiary hearing on Defendant's Motion was held on July 23, 2019. For the reasons that follow, the Court will deny Defendant's Motion for a New Trial.[1]

### I.    BACKGROUND

Following a jury trial, Defendant was convicted on June 26, 2018 of the three counts with which he was charged in a six-count Second Superseding Indictment filed by the Government on

---

[1] At the outset of the continued sentencing hearing for Defendant Gutierrez-Calderon on July 25, 2019, the Court announced its ruling that Defendant's Motion for a New Trial was denied and that the Court's Opinion would follow. This Memorandum Opinion contains the Court's rationale for its ruling.

February 21, 2018.[2] On November 15, 2018—nearly five months after the jury entered its verdict—Defendant filed a *pro se* motion titled "Motion to Inform the Court and to Request an Evidentiary Hearing," asserting that his Sixth Amendment right to a public trial was violated in this case based on the alleged exclusion of his cousin and friend from the courtroom during jury selection. (Dkt. No. 1708). During sentencing proceedings on November 26, 2018, the Court engaged in a colloquy with Defendant's counsel, Mark L. Milligan, Esq. ("Attorney Milligan"), who represented that he became aware of Defendant's *pro se* motion after it was filed, and had subsequently been informed by Defendant of the alleged facts underlying the motion. The Court therefore ordered Defendant's counsel to supplement Defendant's *pro se* motion to "(1) identify the statute or rule pursuant to which Defendant's Motion is filed and explain the basis for the Court's jurisdiction to rule on the Motion; (2) identify the specific facts giving rise to Defendant's Motion, including, but not limited to, the names, if known, of all Court staff involved in the alleged exclusion of individuals from the Courtroom during jury selection in the second trial of this matter, as well as the dates and times of any such occurrences; and (3) include as exhibits declarations from the individuals allegedly excluded from the Courtroom that explain in detail what transpired with respect to their alleged exclusions." (Dkt. No. 1726). Sentencing proceedings were continued to allow for briefing of the issue, and Defendant subsequently filed the instant Motion for a New Trial and Memorandum in Support.

In support of his Motion for a New Trial—which Defendant brings pursuant to Rule 33 of

---

[2] A first trial in this matter resulted in a mistrial in July 2017. After the filing of the Second Superseding Indictment, a second trial began on April 30, 2018. The jury returned guilty verdicts against Defendant Gutierrez-Calderon and five codefendants on June 26, 2018. Defendant Gutierrez-Calderon was convicted of conspiracy to possess a controlled substance (Count 1), attempted possession of cocaine with intent to distribute (Count 2); and possession of cocaine with intent to distribute (Count 6).

the Federal Rules of Criminal Procedure—Defendant asserts that his Sixth Amendment right to a public trial was violated by the alleged exclusion of his cousin, Elvis Calderon-Castro, and friend, Dinia Rodriguez,[3] from the courtroom during the jury selection process. (Dkt. No. 1735 at 1-2).[4] Relying on affidavits attached to his Motion, Defendant contends that this alleged courtroom closure constitutes a "structural error" in his trial, and that he is therefore entitled to a new trial. *Id.*

An evidentiary hearing on Defendant's Motion was held on July 23, 2019, at which Defendant called Mr. Calderon-Castro and Ms. Rodriguez as witnesses. The Government called Marilyn Arroyo, Generalist Supervisor for the District Court of the Virgin Islands, Division of St. Croix, as a witness. The following record emerged through testimony at the evidentiary hearing.

### A.     Testimony of Elvis Calderon-Castro

Elvis Calderon-Castro is Defendant Gutierrez-Calderon's cousin. He testified as follows:

Mr. Calderon-Castro arrived at the Almeric L. Christian Federal Building (hereinafter, "the federal building")—which seats the District Court of the Virgin Islands for the Division of St. Croix—on the first day of jury selection on April 30, 2018 to bring Defendant Gutierrez-Calderon clothing and to watch the jury selection proceedings.[5] He arrived at the federal building at approximately 7:30 or 8:00 a.m., and was denied entry into the federal building by security guards.

A similar scenario played out multiple times during the week of jury selection. Mr. Calderon-Castro would arrive at the federal building in the mornings between 7:30 and 8:00 a.m.

---

[3] Dinia Rodriguez is the wife of codefendant Sergio Quinones-Davila. Defendant Quinones-Davila did not join in Defendant Gutierrez-Calderon's Motion for a New Trial or otherwise allege a violation of his right to a public trial.

[4] Jury selection in this matter lasted five days—from April 30, 2018 until May 4, 2018.

[5] Because Defendant Gutierrez-Calderon and his codefendants were detained pending trial, clothing was delivered to them prior to courtroom appearances in order that the defendants would not be dressed in prison uniforms during the jury trial.

with clothing for Defendant Gutierrez-Calderon; would be denied entry into the building by security guards; and would therefore leave Defendant Gutierrez-Calderon's clothing with Dinia Rodriguez, who was also present outside of the federal building at those times.[6] After being denied entry into the federal building, Mr. Calderon-Castro would go to work and return to the federal building in the afternoon. He would again be denied entry into the federal building when he returned in the afternoon. The only time that Mr. Calderon-Castro was permitted entry into the federal building during the week of jury selection was on Friday afternoon. However, after jury selection concluded, he attended the trial between one and three times per week, and was permitted entry into the federal building and into the courtroom on all of those occasions.

Mr. Calderon-Castro discussed his exclusion from the federal building with Ms. Rodriguez, and told Defendant Gutierrez-Calderon's counsel, Attorney Milligan, on the Monday following the week of jury selection that he had been excluded from the federal building.

### B. Testimony of Dinia Rodriguez

Dinia Rodriguez is married to Defendant Sergio Quinones-Davila and is friends with Defendant Gutierrez-Calderon, Anibal Vega-Arizmendi, and Jean-Carlos Vega-Arizmendi. She testified as follows:

Ms. Rodriguez arrived at the federal building on Monday, April 30, 2018 to bring clothing for Defendant Quinones-Davila and to watch the jury selection proceedings.[7] She entered the courtroom at approximately 9:00 or 9:30 a.m. that morning, but was told she would have to leave

---

[6] When asked on cross-examination whether he would leave Defendant Gutierrez-Calderon's clothing outside with Ms. Rodriguez because the federal building was not yet open when he arrived between 7:30 and 8:00 a.m., Mr. Calderon-Castro initially replied in the affirmative. He later stated, however, that he would remain at the federal building until it was opened to the public, but would still be denied entry by security guards at that point.

[7] Ms. Rodriguez did not state that she was denied entry into the federal building at any point.

the courtroom when the jury was called in by a "lady who was reading papers" in front of the courtroom and a United States Marshal named "Jerry."[8] A third woman whom Ms. Rodriguez believed was named "Marilyn" was also present.

Ms. Rodriguez sat on a bench in the back of the courtroom. Defendant Quinones-Davila, Defendant Gutierrez-Calderon, and the other codefendants were in the courtroom at the time. Ms. Rodriguez did not speak to any of the defendants, but both Defendant Quinones-Davila and Defendant Gutierrez-Calderon saw her and gestured to her. Ms. Rodriguez could not recall how long she sat on the bench in the courtroom, but was asked to leave when the jury came in. Ms. Rodriguez left the courtroom and sat down on a bench on the balcony in front of the courtroom. She was then told by the "ladies who were bringing in the jury" that she would have to move from the bench. Ms. Rodriguez went downstairs and exited the federal building to smoke, and then came back into the federal building.[9]

Ms. Rodriguez remained in and around the federal building the rest of the day, and occasionally returned upstairs to ask Marilyn whether there was space to enter the courtroom. Marilyn informed Ms. Rodriguez that there was no space in the courtroom, but that she would be accommodated as soon as space in the courtroom was available. Ms. Rodriguez was not permitted to reenter the courtroom during the first day of jury selection.

Ms. Rodriguez spoke with Marilyn in Spanish and did not have any difficulty understanding her. She spoke with Jerry in English. Ms. Rodriguez stated that neither Marilyn nor Jerry informed her on the first day of jury selection that she could observe the jury selection

---

[8] Ms. Rodriguez further identified the "lady who was reading papers" as the woman who brought food in for the jury during the trial.

[9] The public entrance to the federal building is located on the second floor. Courtroom 1, where the jury selection and trial were held, is located on the third floor of the federal building.

proceedings in a separate room downstairs, and that she was otherwise unaware that an option existed for viewing the jury proceedings in this separate room.

Ms. Rodriguez returned to the federal building on Tuesday, May 1, 2018 around 7:30 or 8:00 a.m. with clothing for Defendant Quinones-Davila and the "rest of the boys."[10] She attempted to enter the courtroom, but was told by Jerry that she could not enter. She went to sit on a bench downstairs, and was unable to enter the courtroom at any point on May 1, 2018. Ms. Rodriguez attempted to enter the courtroom again on Wednesday, May 2, 2018, but there was still no space available.

While at the federal building on Thursday, May 3, 2018, Ms. Rodriguez was told by Marilyn that it might be possible to accommodate her in a room downstairs to view the jury selection proceedings. Ms. Rodriguez sat on a bench downstairs, but a woman named "Julia" and another short-haired woman told her that she could not be near the jury and had to leave. Ms. Rodriguez was therefore unable to enter the room downstairs during the morning of May 3, 2018. Later in the afternoon, Ms. Rodriguez was permitted to enter the room downstairs. The room contained a television screen, which was displaying the ongoing jury selection proceedings in the courtroom. However, no sound was being emitted from the television, and a technician was working to correct the problem. Ms. Rodriguez stayed in the room until the judge called for a recess.[11] She then exited the room, and when she came back later there was nothing on the screen. Ms. Rodriguez was therefore unable to observe the jury selection proceedings on May 3, 2018.

---

[10] Ms. Rodriguez again did not state that she had any problems gaining entry into the federal building.

[11] When questioned about this point on cross-examination, Ms. Rodriguez stated that, although she could not hear the judge call for a recess, she was able to infer that the judge had recessed the proceedings based on her visual observations.

She did not inform anyone about the difficulties she experienced in viewing the jury selection proceedings.

Ms. Rodriguez returned to the federal building on Friday, May 4, 2018. At some point during the day, space opened up in the courtroom, and Marilyn informed Ms. Rodriguez that she could come into the courtroom and sit quietly.[12] Ms. Rodriguez was in the courtroom from around 5:00 p.m. to 6:00 p.m., and was present as members of the jury were selected.

Ms. Rodriguez had opportunities to talk with Defendant Quinones-Davila's counsel—Kye Walker, Esq.—during lunch breaks and recesses during the week of jury selection. Initially, Ms. Rodriguez testified that she asked Attorney Walker on the third day of the jury selection proceedings why she was not permitted to enter the courtroom.[13] Later, Ms. Rodriguez stated that she could not recall when she informed Attorney Walker that she was not able to enter the courtroom during the jury selection proceedings. Ms. Rodriguez informed Defendant Quinones-Davila by phone that she had been unable to enter the courtroom during jury selection, but could not recall when she spoke with Defendant Quinones-Davila about the issue. Ms. Rodriguez did not discuss her exclusion from the courtroom with Defendant Gutierrez-Calderon's counsel.

When asked about her attendance during the first trial of this matter, Ms. Rodriguez stated that she and family members of other defendants were excluded from jury selection during that trial as well. She testified that she did not observe the jury selection proceedings from a separate room downstairs during the first trial, and did not know that such a room existed.

---

[12] Ms. Rodriguez testified that she was allowed into the courtroom at the same time that a juror realized she had left a placard bearing her juror number in the restroom.

[13] Ms. Rodriguez was not asked and did not testify regarding any response to this question by Attorney Walker.

### C. Testimony of Marilyn Arroyo

Marilyn Arroyo is the Generalist Supervisor for the District Court of the Virgin Islands, Division of St. Croix. She testified as follows:

Ms. Arroyo's role as Generalist Supervisor involves some coordination of jury issues for the District Court of the Virgin Islands, Division of St. Croix. She was involved in coordinating jury matters for the first and second trials in the instant case. In anticipation of the large number of potential jurors that would appear for the jury selection proceedings at both trials, the jury assembly room on the second floor of the federal building was converted into an "overflow room" prior to each trial. The overflow room was designed to serve as an extension of the courtroom in the event that members of the jury pool and the public were unable to fit inside the courtroom during the jury selection proceedings. A television screen was installed in the overflow room to display a visual and audio live feed of proceedings in the courtroom. The overflow room was available to anyone interested in viewing the jury selection proceedings.

The concept of creating an overflow room as an extension of the courtroom to accommodate members of the jury panel and the public arose from Ms. Arroyo's past experience managing juries. Prior to the first trial in this matter, Ms. Arroyo consulted with her then-supervisor—Joanne Barry—who approved the concept. Ms. Arroyo then verified that the concept could be implemented with the district court's information technology department. She received approval to move forward with establishing the overflow room from the undersigned Chief Judge prior to the commencement of the first trial in this matter.

Ms. Arroyo first met Ms. Rodriguez during the first trial, when Ms. Rodriguez introduced herself as the wife of Defendant Quinones-Davila. At the first trial, there was insufficient space in the courtroom to seat all members of the jury pool, and some members of the jury pool were

therefore seated in the overflow room during the *voir dire* process. The overflow room was divided into two seating sections—one for members of the jury pool and another for the public. Members of the public were invited to view the jury selection proceedings in the overflow room and were seated in the section designated for the public. Ms. Arroyo recalled seeing Ms. Rodriguez seated in the overflow room during the jury selection proceedings at the first trial.

On April 30, 2018—the first day of jury selection during the second trial of this matter—Ms. Arroyo was inside the courtroom along with United States Deputy Marshal Gerald Messier helping to seat jurors prior to the start of the *voir dire* process.[14] One-hundred-and-thirty (130) prospective jurors reported for jury duty that morning. Although additional seating had been arranged in the courtroom, all of the seats were filled with prospective jurors. There were no additional seats available and there was no space to add further seating in the courtroom. Although the entire jury pool was able to fit inside the courtroom, had any additional jury panel members appeared, the overflow room would have been used to seat those jurors.

While Ms. Arroyo was in the courtroom, the courtroom double doors opened and Ms. Arroyo saw Ms. Rodriguez and another unidentified woman entering the courtroom. Deputy Marshal Messier informed Ms. Rodriguez and the second woman that there were no seats available in the courtroom. Ms. Arroyo interjected and mentioned to Deputy Marshal Messier that seating was available to view the jury selection proceedings in the overflow room on the second floor of the federal building.[15] Deputy Marshal Messier repeated this information to the two women, and

---

[14] Ms. Arroyo stated that Deputy Marshal Messier is also known as "Jerry."

[15] Although Ms. Arroyo directed her comments to Deputy Marshal Messier, she was standing next to him and stated that Ms. Rodriguez could hear her comments.

directed them to the overflow room.[16] Ms. Rodriguez and the second woman exited the courtroom.

Ms. Arroyo exited the courtroom as the *voir dire* process was set to begin. She observed Ms. Rodriguez, the unidentified woman, and other individuals seated on benches in front of the courtroom. Ms. Arroyo reminded these individuals that seating was available in the overflow room to view the jury proceedings, and offered to escort them to the overflow room. Ms. Rodriguez stated that she knew where the overflow room was and that she would go there when she was ready. Ms. Arroyo conducted this conversation with Ms. Rodriguez in Spanish. Ms. Arroyo did not recall having any other interactions with Ms. Rodriguez during the first day of jury selection, although she remembered seeing Ms. Rodriguez in the corridor of the third floor of the federal building. Ms. Arroyo did not discuss the interactions she had with Ms. Rodriguez with the undersigned Chief Judge, who presided over this matter.

Ms. Arroyo recalled that prospective jurors arrived in staggered groups on the second day of jury selection on May 1, 2018. She could not recall whether the prospective jurors arrived in staggered groups on the other days of jury selection. Ms. Arroyo was not responsible for monitoring the flow of individuals into and out of the courtroom throughout the week of jury selection, and believed that monitoring of the courtroom was the responsibility of the United States Marshals Service. Ms. Arroyo entered the overflow room at different points during the week of jury selection. Each time she entered, the live feed from the courtroom was displayed and the camera was focused on the judge's bench. She did not see anyone sitting in the overflow room to observe the jury selection proceedings on any of the occasions that she entered the overflow room.

---

[16] Deputy Marshal Messier and Ms. Arroyo spoke to Ms. Rodriguez and the second woman in English during this conversation.

## II.    DISCUSSION

### A.    Applicable Legal Principles

The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. CONST. amend. VI. "The Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors." *Presley v. Georgia*, 558 U.S. 209, 213 (2010). Trial courts are "obligated to take every reasonable measure to accommodate public attendance at criminal trials[,]" including during the *voir dire* of prospective jurors. *Id.* at 215. Accordingly, a defendant's Sixth Amendment right to a public trial may be violated where the public is barred from jury selection proceedings as the result of a courtroom closure. *United States v. Negron-Sostre*, 790 F.3d 295, 304 (1st Cir. 2015).

Because the right to a public trial is among "certain basic, constitutional guarantees that should define the framework of any criminal trial[,]" the Supreme Court has recognized that "a violation of the right to a public trial is structural error." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907, 1908 (2017). Thus, as is the case with other structural errors, "where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* at 1910 (quoting *Neder v. United States*, 572 U.S. 1, 7 (1999)).

Nonetheless, the Supreme Court has also recognized that "while the public-trial right is important for fundamental reasons, in some cases an unlawful [courtroom] closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." *Id.* Noting that errors have been categorized as "structural" for various reasons, the Supreme Court in *Weaver* observed that the structural nature of the public-trial right arises from both the "difficulty of

11

assessing the effect of the error" and the fact that the public-trial right implicates "some interests that do not belong to the defendant." *Id.* ("[T]he right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused.") (internal quotation and citations omitted). Accordingly, because "one [] factor leading to the classification of structural error is that the public-trial right furthers interests other than protecting the defendant against unjust conviction," it follows that a trial may still be "fundamentally fair from the defendant's standpoint" despite an unlawful closure. *Id.*

Circuit courts have also observed that while reversal of a conviction is "ordinarily automatic" where "a criminal trial is conducted in a manner that renders it unfair by depriving the defendant of a fundamental structural right . . . [i]t does not necessarily follow [] that every deprivation in a category considered to be 'structural' constitutes a violation of the Constitution or requires reversal of the conviction, no matter how brief the deprivation or how trivial the proceedings that occurred during the period of deprivation." *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009) (citations omitted); *see also United States v. Patton*, 502 F. App'x 139, 142 (3d Cir. 2012) (recognizing that a courtroom closure which is "considered trivial" does not offend the Sixth Amendment) (citations omitted); *United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007) ("[E]ven a problematic courtroom closing can be 'too trivial to amount to a violation of the [Sixth] Amendment.'") (quoting *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996)).

To determine whether an unjustified courtroom closure is trivial, courts consider the extent to which the closure infringes on the values that are furthered by the Sixth Amendment's guarantee of the right to a public trial as identified by the Supreme Court in *Waller v. Georgia*, 467 U.S. 39 (2010): "(1) ensuring a fair trial, (2) reminding the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) encouraging witnesses to come forward, and

(4) discouraging perjury." *Gibbons*, 555 F.3d at 121 (citing *Peterson*, 85 F.3d at 43). The actions of the trial court, including the trial judge's awareness of a closure, are relevant to the determination. *Patton*, 502 F. App'x at 142 (citing *United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994); *Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975)).[17]

### B.    Analysis

The Government presents four arguments in support of its contention that Defendant's Motion for a New Trial should be denied. The Court addresses each in turn.

### 1.  Waiver of the Right to a Public Trial

Without conceding that the courtroom was closed in this case, the Government contends that Defendant waived his right to challenge the alleged violation of his right to a public trial because he "knew, or should have known, that his family member and friend were absent during the jury selection process" but failed to inform his counsel or raise the issue until approximately six and one-half months after the alleged closure took place. (Dkt. No. 1751 at 5).

The Supreme Court has recognized the Sixth Amendment right to public trial as among those rights that are subject to waiver. *Peretz v. United States*, 501 U.S. 923, 936 (1991) (citing *Levine v. United States,* 362 U.S. 610, 619 (1960)). Various courts have concluded that such a waiver may be effectuated by either the defendant's affirmative acquiescence in the closure or his failure to timely object. *See, e.g., Johnson v. Sherry*, 586 F.3d 439, 444 (6th Cir. 2009), *abrogated on other grounds by Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) (right to public trial "can be waived when a defendant fails to object to the closure of the courtroom");

---

[17] As expressed by the Second Circuit, the triviality inquiry is "very different from a harmless error inquiry" and focuses on "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment." *United States v. Gupta*, 699 F.3d 682, 688 (2d Cir. 2012) (quoting *Peterson*, 85 F.3d at 42).

*United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006) ("Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial."); *United States v. Christi*, 682 F.3d 138, 142 (1st Cir. 2012) (right to public trial waived where prosecutor raised concerns about courtroom closure to trial judge and defense counsel made no comment, as defense counsel's silence was "reasonably understood only as signifying agreement that there was nothing objectionable"); *United States v. Rivera*, 682 F.3d 1223, 1232 (9th Cir. 2012) ("Although the right to a public trial provides benefits to society as a whole, [] a defendant may nevertheless forfeit the right, either by affirmatively waiving it or by failing to assert it in a timely fashion.") (internal citation omitted)). At least one circuit court, however, has held that a mere failure to object to a courtroom closure does not result in the waiver of a defendant's public trial right, and that any such waiver must be knowing and voluntary. *See Walton v. Briley*, 361 F.3d 431, 434 (7th Cir. 2004) (right to public trial was not waived where "the record d[id] not indicate that Walton intelligently and voluntarily relinquished a known right").

Assuming for purposes of this argument that Ms. Rodriguez and Mr. Calderon were excluded from the courtroom, the Government asserts that there is sufficient evidence in the record from which the Court may infer that Defendant Gutierrez-Calderon was aware of the alleged exclusion, and therefore waived his public-trial right by failing to raise an objection. Specifically, the Government argues that because Defendant Gutierrez-Calderon was in the courtroom on each day of the jury selection process and—according to Ms. Rodriguez—saw Ms. Rodriguez leave the courtroom on the first day of jury selection on April 30, 2018, an inference that Defendant was aware of Ms. Rodriguez's alleged exclusion may be drawn.

The testimony of Ms. Rodriguez and Mr. Calderon-Castro—if credited—indicates that they were not present in the courtroom during the jury selection process until the afternoon of the

fifth day, with the exception of Ms. Rodriguez's brief presence in the courtroom on the first day of the jury selection proceedings. While the Court finds that a reasonable inference can be drawn from this testimony that Defendant Gutierrez-Calderon—who was in the courtroom during the jury selection process—was aware that Ms. Rodriguez and Mr. Calderon-Castro were not present in the courtroom, it does not find the testimony sufficient to draw the conclusion that Defendant Gutierrez-Calderon was aware that their absences were the result of their alleged exclusion from the courtroom. There was no credible testimony which indicates that Ms. Rodriguez or Mr. Calderon-Castro brought their alleged exclusion from the courtroom to the attention of Defendant Gutierrez-Calderon or his counsel.[18] Thus, even if Defendant Gutierrez-Calderon was aware that Ms. Rodriguez and Mr. Calderon-Castro were not present in the courtroom, this awareness alone is insufficient to support a finding that Defendant Gutierrez-Calderon waived his right to a public trial where there is no indication that he knew that their absences from the courtroom resulted from an alleged courtroom closure. Accordingly, the Court finds that Defendant Gutierrez-Calderon did not waive his right to a public trial by failing to timely object to the alleged courtroom closure under these circumstances.

### 2. Timeliness of Defendant's Motion for a New Trial

The Government argues that Defendant's Motion for a New Trial is untimely under Federal Rule of Criminal Procedure 33 ("Rule 33"). (Dkt. No. 1751 at 6-7). Rule 33 provides, in pertinent

---

[18] Although Mr. Calderon-Castro testified during the July 23, 2019 evidentiary hearing that he informed Attorney Milligan on the Monday following the week of the jury selection proceedings that he had been excluded from the federal building and courtroom, the Court finds Mr. Calderon-Castro's testimony to be of limited credibility, for reasons discussed further below. The Court therefore gives little weight to the assertions made by Mr. Calderon-Castro. Attorney Milligan represented during the evidentiary hearing that he had no recollection of Mr. Calderon-Castro informing him about the alleged exclusion from the federal building and courtroom as claimed by Mr. Calderon-Castro.

part, that on a defendant's motion, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Rule 33 further provides that where a defendant's motion for a new trial is "grounded on newly discovered evidence," the motion "must be filed within 3 years after the verdict or finding of guilty." FED. R. CRIM. P. 33(b)(1). A motion for a new trial "grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilt." FED. R. CRIM. P. 33(b)(2).

Because it was filed more than five months after the jury's verdicts were entered,[19] Defendant Gutierrez-Calderon's Motion for a New Trial is timely only if it is grounded on newly discovered evidence under Rule 33(b)(1). The Government contends that Defendant's Motion does not meet the requirements of Rule 33(b)(1) because information regarding the alleged exclusion of members of the public from the *voir dire* proceedings is not pertinent to Defendant's guilt or innocence, and therefore does not constitute "newly discovered evidence" for purposes of the rule. (Dkt. No. 1761 at 6-7).

In support of its position, the Government points out that the Third Circuit has identified five requirements that a defendant must satisfy to demonstrate his entitlement to a new trial based on newly discovered evidence. Specifically, a "defendant must (1) identify newly discovered evidence; (2) allege facts from which his diligence can be inferred; (3) demonstrate the evidence is not merely cumulative or impeaching; (4) show the evidence is material to the issues involved; and (5) show the evidence is such that, if introduced at trial, it would probably produce an acquittal." *United States v. Napolitan*, 762 F.3d 297, 305 (3d Cir. 2014) (citing *United States v.*

---

[19] As noted above, the *pro se* motion in which Defendant first raised the issue of an alleged courtroom closure was filed on November 15, 2018, nearly five months after the jury's verdicts were entered. The instant Motion for a New Trial was filed on December 10, 2018, more than five months after the jury's verdicts were entered.

*Kelly,* 539 F.3d 172, 181-82 (3d Cir. 2008)). The Government contends that information related to the alleged exclusion of the public from the courtroom is not evidence of the type that could be introduced at trial to produce a defendant's acquittal, and thus does not qualify as "newly discovered evidence" under Rule 33(b)(1).

A number of courts have taken a position similar to the Government's here that "newly discovered evidence" for purposes of Rule 33(b)(1) refers exclusively to evidence material to the question of a defendant's guilt or innocence. *See, e.g., United States v. Hanoum*, 33 F.3d 1128, 1130 (9th Cir. 1994) ("We hold that a Rule 33 motion based upon 'newly discovered evidence' is limited to where the newly discovered evidence relates to the elements of the crime charged."); *United States v. Blackwell*, 436 F. App'x 192, 198 (4th Cir. 2011) (same); *United States v. Smith*, 62 F.3d 641, 649 (4th Cir. 1995) (holding that allegations of ineffective assistance of counsel do not constitute "newly discovered evidence" because the purpose of Rule 33(b)(1) is "to enable the district court to afford relief when new information bolsters a claim of actual innocence").

Other courts have observed that a Rule 33(b)(1) motion may be properly advanced under circumstances where the newly discovered evidence does not go *directly* to the question of guilt or innocence. *See, e.g., United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (observing that "[n]ewly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, 'but may be probative of another issue of law'" such as "the existence of a *Brady* violation, as well as questions regarding the fairness or impartiality of a jury") (quoting *United States v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978)); *United States v. McRae*, 795 F.3d 471, 481 (5th Cir. 2015) (observing in the context of a Rule 33(b)(1) motion involving allegations that a jury was tainted by pretrial publicity that "[t]he Rule 33 motion for a new trial goes to the fairness of the trial rather than to the question of guilt or innocence") (internal quotation and

quotation marks omitted). The Third Circuit has similarly recognized that newly discovered evidence of juror misconduct may provide a basis for a Rule 33(b)(1) motion, so long as the evidence is in fact "newly discovered and that the defendant's failure to discover the information during the trial was not a result of lack of diligence[.]" *United States v. Richards*, 241 F.3d 335, 343 (3d Cir. 2001).

Even if the newly discovered evidence providing the basis for a Rule 33(b)(1) motion need not go *directly* to the question of a defendant's guilt or innocence under certain circumstances, the cases appear to suggest that the evidence at issue must bear at least an indirect connection to guilt or innocence. The cases do not suggest that evidence may properly be categorized as "newly discovered evidence" for purposes of the rule where it has no bearing whatsoever—either directly *or* indirectly—on the jury's finding of guilt or innocence. That is the case here, where the evidence of an alleged courtroom closure has no bearing on the jury's finding of guilt or innocence.

In the Court's view, evidence related to alleged juror misconduct or bias, or a *Brady* violation, is altogether distinct from evidence of an alleged courtroom closure for purposes of a Rule 33(b)(1) motion. While information related to alleged juror misconduct or bias, or a *Brady* violation, does not bear directly on the elements of a crime charged, it does implicate the question of the basis for a jury's finding of guilt or innocence. Evidence that a juror may have been biased, that a jury may have been improperly influenced, or that exculpatory information may have been withheld by the prosecution suggests that a jury's verdict may not have been the product of a fair and impartial consideration of the evidence presented at trial—thus bearing, at least indirectly, on a jury's ultimate finding of guilt or innocence. Information that a courtroom may have been improperly closed to the public, on the other hand, has no bearing on the question of a defendant's guilt or innocence or the basis for a jury's verdict—at least under the circumstances here.

Information that members of the public allegedly were unable to be seated in a courtroom filled to capacity with prospective jurors during the jury selection proceedings does not raise questions about the jury's ultimate finding of guilt or innocence.

In sum, having considered the parties' arguments and the applicable caselaw, the Court concludes that the evidence that Defendant Gutierrez-Calderon has offered regarding an alleged courtroom closure is not properly considered "newly discovered evidence" for purposes of Rule 33(b)(1), as the evidence has no bearing—either directly or indirectly—on Defendant's guilt or innocence. Because Defendant Gutierrez-Calderon's Motion for a New Trial is therefore not grounded on "newly discovered evidence," it was only timely if filed pursuant to Rule 33(b)(2) "within 14 days after the verdict or finding of guilt." FED. R. CRIM. P. 33(b)(2). Both the *pro se* motion filed by Defendant in which he first raised the issue of an alleged courtroom closure and the subsequently-filed Motion for a New Trial were filed long after this 14-day period had expired. As such, Defendant's Motion for a New Trial is untimely under Rule 33, and will accordingly be denied.

### 3.   Whether a Courtroom Closure Occurred

Even if the Court were to conclude that Defendant's Motion for a New Trial is grounded on "newly discovered evidence" such that it was timely filed under Rule 33(b)(1), the Government maintains that the Motion should be denied because no courtroom closure occurred in this case. The Government contends that—even if Ms. Rodriguez and Mr. Calderon-Castro were unable to be seated in the courtroom during the jury selection proceedings—they were not excluded from the proceedings because an option to view the jury selection proceedings in the overflow room was available. (Dkt. No. 1751 at 8). The Court agrees.

As described in Ms. Arroyo's testimony, the Court anticipated before both the first and second trials in this matter that seating space in the courtroom would be insufficient given the size of the jury pools. Court staff therefore designed a plan to accommodate both members of the jury pool and members of the public who were unable to be physically seated in the courtroom during the jury selection proceedings. This plan involved the establishment of an overflow room to serve as an extension of the courtroom. The overflow room contained a television screen that broadcast a live feed of the courtroom in order that potential jurors could participate in the jury selection proceedings and members of the public could observe those proceedings from the overflow room.

Given the size of the jury pool at the first trial, the overflow room was used to seat members of the jury pool during the first day of the jury selection proceedings on May 2, 2017. The Court noted that the jury pool was split in this fashion during its opening remarks that day, emphasizing to the members of the jury pool seated in the overflow room that they were as much a part of the jury selection proceedings as those seated in the courtroom. The Court stated:

> I want to first start by thanking you for your presence here today in response to the jury summons that was issued to each of you. Because of the number of prospective jurors called today, we have jurors in both the courtroom and the jury assembly room downstairs. I want to emphasize that those of you who are in the jury assembly room downstairs are as much a part of this process as the jurors who are here in the courtroom. I can see you, I can hear you, and I trust that you can see me and hear me as well. My comments and the question that I will be posing to the jury panel today will be directed to you in the jury assembly room as well. And I will be addressing you in the same manner as I will be addressing those here in the courtroom.

Ms. Arroyo testified that the overflow room was divided into two sections—one for members of the jury pool and one for the public. During the first trial, members of the public were seated in the assigned section of the overflow room to observe the jury selection proceedings. Although Ms. Rodriguez testified that she did not observe the jury selection proceedings in the overflow room during the first trial and was not aware that the overflow room existed, Ms. Arroyo

testified that she saw Ms. Rodriguez in the overflow room during the jury selection proceedings at the first trial.

The overflow room was again established as an extension of the courtroom for use during the jury selection proceedings at the second trial. Because it was possible to seat the full 130-member jury panel in the courtroom for the jury selection process, it was unnecessary to seat members of the jury pool in the overflow room during the second trial. However, the overflow room was still available for members of the public who were unable to be seated in the courtroom and wished to observe the jury selection proceedings.

The Court finds that there was no courtroom closure under these circumstances. At no point did the Court order that the courtroom be closed or direct that any member of the public be prevented from entering the courtroom. However, anticipating that the courtroom might be filled to seating capacity with members of the jury pool because of the large number of prospective jurors called to participate in the jury selection proceedings, the Court made efforts to ensure that members of the public were permitted to view the jury selection proceedings via live feed in the overflow room—a room that was specifically established by the Court as an *extension* of the courtroom, as reflected by the fact that members of the jury pool themselves were seated in the overflow room during the first trial. Thus, far from barring the public from the jury selection proceedings, the Court took proactive steps to comply with its obligation "to take every reasonable measure to accommodate public attendance at criminal trials" by establishing the overflow room to accommodate members of the public who wished to view the jury selection proceedings. *Presley*, 558 U.S. at 213. At no point during jury selection or throughout the trial was the Court informed that Ms. Rodriguez, Mr. Calderon-Castro, or any other member of the public felt that they had been excluded from the jury selection proceedings.

21

While neither party pointed the Court to cases involving circumstances directly on point, the Court notes that a district court in the Western District of Washington considered a similar Sixth Amendment claim on habeas review in *Rollness v. United States*, 2013 WL 4498684 (W.D. Wash. Aug. 21, 2013). In *Rollness*, a habeas petitioner alleged that members of his family and the public were excluded from the courtroom during the *voir dire* proceedings at his trial, and brought an ineffective assistance of counsel claim based on his counsel's failure to object to the alleged closure. *Id.* at 17. At a status conference with the parties prior to the trial, the trial judge advised the parties that the jury selection proceedings would not be held in the judge's regular courtroom, but would instead be held in a larger courtroom to accommodate more people. *Id.* at 18. Anticipating a large number of potential jurors, the trial judge informed the parties that "there likely would not be room for the public even in the larger [] courtroom at the beginning of jury selection and that an overflow courtroom would therefore be set up where people could watch the jury selection on video." *Id.*

In a Report and Recommendation that was adopted in full by the district court, a magistrate judge concluded under these circumstances that it was "clear from the record that the trial judge made reasonable efforts to accommodate public attendance at jury selection." *Id.* The magistrate judge further found that the petitioner had failed to put forth any evidence that members of his family were excluded from viewing the jury selection proceedings. In an affidavit, the petitioner's wife stated that "the petitioner's family was told there was [not] enough room for them to be present during jury selection," and that the family members "did not know it was [their] right to watch the proceeding via camera from another room." *Id.* The magistrate judge concluded that this affidavit failed to corroborate the petitioner's assertion that his family was prevented from viewing the jury selection proceedings, and instead "establish[d] only that the family did not know there

was an option available to them for viewing that portion of the trial." *Id.* Accordingly, the magistrate judge found that the petitioner had failed to demonstrate that the courtroom was "effectively closed to his family during jury selection," and recommended that petitioner's ineffective assistance of counsel claim be denied. *Id.*

In *Swain v. Larose*, 2016 WL 8674570 (N.D. Ohio July 29, 2016), *report and recommendation adopted*, 2016 WL 4486853 (N.D. Ohio Aug. 26, 2016)—a case involving circumstances quite similar to those at issue here—an Ohio state trial court confronted a scenario in which "the biggest available courtroom was too small to accommodate the prospective jurors as well as all of appellant's family and members of the general public who wanted to observe the proceedings." *Id.* at 13. The trial court therefore set up video conferencing equipment in a second courtroom to permit the public to view the *voir dire* proceedings. *Id.* After the jury was chosen, members of the public returned to the courtroom to observe the rest of the trial. *Id.* In ruling on Swain's subsequently-filed habeas motion, a magistrate judge concluded that Swain's right to a public trial was not violated because "the trial court properly considered the limitations of the existing available facilities, and made appropriate accommodations so that the public could observe" the jury selection proceedings. *Id.*

As was the case in *Rollness* and *Swain*, the Court concludes that the courtroom was not closed during the jury selection proceedings in this case where members of the public who could not be seated in the courtroom were provided with an option to view the jury selection proceedings via live feed in an overflow room established for the specific purpose of serving as an extension of the courtroom.[20] The Court rejects arguments made by Defendant during the evidentiary hearing

---

[20] As discussed further below, the basis for such a finding here is even more compelling than in *Rollness*, as the Court does not credit Ms. Rodriguez's claim that she was unaware of the existence of the overflow room and its availability for her use.

that a closure of the courtroom occurred despite the availability of an overflow room because an indeterminate number of seats had to be reserved in the courtroom for the public even if the result was that the courtroom could not accommodate the entire jury pool. Defendant points to no authority for this proposition. The Court finds, to the contrary, that—to the extent that practical limits on the availability of seating in the courtroom due to the large jury pool resulted in the absence of seating for members of the public during the jury selection proceedings—the provision of an overflow room to permit public viewing of the jury selection proceedings ensured that the public was not barred from observing the *voir dire* process.

The Court recognizes that there was testimony from Mr. Calderon-Castro during the evidentiary hearing that he was barred from entering the federal building *at all* during jury selection at the second trial. On the record before it, however, the Court does not credit this testimony by Mr. Calderon-Castro.

Significantly, Mr. Calderon-Castro's testimony does not align with the statement he provided by affidavit in support of Defendant's Motion for a New Trial. In his affidavit, Mr. Calderon-Castro represented that, on the first day of jury selection during the second trial, he was informed by security personnel "*as [he] enter[ed] the federal building* . . . that [he] could not enter the *courtroom*." (Dkt. No. 1735-1 at ¶¶ 4-5) (emphasis added). Mr. Calderon-Castro further represented that, on the second day of the jury selection proceedings, he was "informed by security personnel that [he] could not enter the *courtroom*." *Id.* at ¶ 8 (emphasis added). Mr. Calderon-Castro's affidavit makes no mention of any alleged exclusion from the federal building. The absence of any such allegation is glaring considering Mr. Calderon-Castro's representation at the evidentiary hearing that he was barred from entering the federal building on multiple mornings

during the week of jury selection, and that he was also barred from entering the federal building when he returned during the afternoons.

Two additional factors call Mr. Calderon-Castro's credibility into question. First, Mr. Calderon-Castro testified that he arrived at the federal building between 7:30 and 8:00 a.m. to bring clothing for Defendant Gutierrez-Calderon. He also testified that Ms. Rodriguez was present when he arrived at the federal building, and that he would leave Defendant Gutierrez-Calderon's clothing with her after being denied entry into the federal building. Ms. Rodriguez, however, did not state that she had any trouble gaining entry into the federal building at any point. Second, Mr. Calderon-Castro testified at the evidentiary hearing that he informed Attorney Milligan about his alleged exclusion from the federal building on the Monday following the week of the jury selection proceedings. Attorney Milligan, however, represented that he had no recollection of Mr. Calderon-Castro making any such allegation. Given the nature and gravity of Mr. Calderon-Castro's allegation, the Court finds it dubious that—had Mr. Calderon-Castro in fact made such an allegation—Attorney Milligan would be unable to recall that the allegation was made.

As such, for the reasons discussed above, the Court does not credit Mr. Calderon-Castro's testimony that he was barred from entering the federal building during jury selection at the second trial. The Court therefore need not consider whether Defendant Gutierrez-Calderon's right to a public trial was violated by the alleged exclusion of Mr. Calderon-Castro from the federal building.

The Court also recognizes that portions of the testimony given by Ms. Rodriguez and Ms. Arroyo conflict with regard to Ms. Rodriguez's awareness of the existence of the overflow room. Ms. Rodriguez testified that she and other members of the public were excluded from the jury selection proceedings during the first trial of this matter. She further testified that she was not made aware of the existence of the overflow room during the first trial, and did not observe the jury

selection proceedings in the overflow room. Ms. Arroyo testified, on the other hand, that members of the public were permitted to observe the jury selection proceedings in the overflow room, and were seated in a section of the overflow room reserved for the public while members of the jury pool were seated in another section. Ms. Arroyo further testified that she recalled seeing Ms. Rodriguez seated in the overflow room during the jury selection proceedings at the first trial.

Ms. Rodriguez testified that she again went uninformed about the existence of the overflow room during the second trial until the fourth day of the jury selection proceedings. She stated that she entered the overflow room on the fourth day, but that the sound on the television monitor was not working and that a technician was working on it. She later left the overflow room, and when she came back there was nothing displayed on the screen.

Ms. Arroyo testified that she reminded Deputy Marshal Messier about the existence of the overflow room on the first day of jury selection at the second trial immediately after he informed Ms. Rodriguez and a second woman that there was no seating available in the courtroom. Deputy Marshal Messier told Ms. Rodriguez and the second woman that they could view the jury selection proceedings in the overflow room. Ms. Arroyo also testified that she encountered Ms. Rodriguez and other members of the public seated on benches in front of the courtroom shortly thereafter. Ms. Arroyo reminded Ms. Rodriguez that she could view the jury selection proceedings in the overflow room, and offered to escort her there. Ms. Rodriguez responded that she knew where the overflow room was, and that she would go there when she was ready. Ms. Arroyo also testified that the live feed of the courtroom was displaying in the overflow room each time that she entered the overflow room during the week of jury selection.

Considering this conflicting testimony and the totality of the circumstances, the Court does not credit Ms. Rodriguez's assertion that she was not made aware of the existence of the overflow

room until the fourth day of jury selection at the second trial. As Ms. Arroyo testified, the overflow room was established for the specific purpose of accommodating members of the jury pool and the public who were unable to be physically seated in the courtroom given the number of prospective jurors called in this case. Having established an overflow room for the specific purpose of enabling the public to view the jury selection proceedings, the Court finds incredible Ms. Rodriguez's allegation that Ms. Arroyo and other Court staff then neglected to inform Ms. Rodriguez about the existence of the overflow room. This is especially so in view of the fact that it is Ms. Arroyo who brought the concept of the overflow room to her then-supervisor for approval, and Ms. Rodriguez's assertions are directly contradicted by Ms. Arroyo's testimony. Accordingly, the Court does not credit Ms. Rodriguez's testimony that she was not informed about the existence of the overflow room until the fourth day of jury proceedings at the second trial. Rather, the Court credits Ms. Arroyo's testimony that Ms. Rodriguez was informed about the overflow room from the outset of the jury selection process during the second trial—and indeed was aware of it and had used it to view the jury selection proceedings during the first trial.

The timing of Ms. Rodriguez's allegations further undermines the credibility of her testimony. Ms. Rodriguez testified that she attended both the first and second trials, and that she was in attendance throughout the entirety of the second trial. There is no indication in the record that Ms. Rodriguez raised a complaint regarding her alleged exclusion from the jury selection proceedings during the first trial. In view of Ms. Rodriguez's regular attendance at both trials, it is difficult to credit any suggestion that she was excluded from the jury selection proceedings during the first trial, but registered no complaint about the alleged exclusion. Rather, the Court finds more

credible Ms. Arroyo's testimony that Ms. Rodriguez was aware of, and used, the overflow room during the jury selection phase of the first trial.[21]

Further, Ms. Rodriguez testified that she informed her husband's counsel, Attorney Kye Walker, about her alleged exclusion from the jury selection proceedings during the second trial. However, Attorney Walker never lodged an objection or otherwise raised the issue with the Court.[22] Again, in view of the gravity of the allegation and the myriad other issues raised by Attorney Walker on behalf of her client—Defendant Quinones-Davila—the Court finds it difficult to credit Ms. Rodriguez's assertion that she raised an alleged exclusion with Attorney Walker that was not raised by Attorney Walker with the Court. Given Ms. Rodriguez's apparent commitment to maintaining a presence at the trials, the fact that Court was not made aware of any complaint by Ms. Rodriguez regarding her alleged exclusion from the jury selection proceedings at either of the trials until the filing of her affidavit on behalf of Defendant Gutierrez-Calderon's Motion for a New Trial more than five months after the second trial concluded casts considerable doubt on the veracity of her testimony and claims of exclusion.

In sum, the Court finds based on the record before it that—to the extent that Ms. Rodriguez or Mr. Calderon-Castro were unable to be physically seated within the courtroom during the jury selection proceedings at the second trial—this circumstance did not constitute a courtroom closure. In order to accommodate members of the public who wished to view the jury selection

---

[21] This version of events is consistent with Ms. Arroyo's testimony that—when asked if she would like to be escorted to the overflow room at the outset of the jury selection phase of the second trial—Ms. Rodriguez declined the invitation, advising that she knew where the overflow room was located and would go there when she was ready.

[22] The Court notes as an additional oddity the fact that, while Ms. Rodriguez testified with respect to her alleged exclusion from the courtroom in support of Defendant Gutierrez-Calderon's Motion for a New Trial, her husband—Defendant Quinones-Davila—has not similarly asserted before this Court that his right to a public trial was violated by Ms. Rodriguez's alleged exclusion.

proceedings, the Court established an overflow room as an extension of the courtroom and provided a live feed of the jury selection proceedings in the overflow room. Thus, far from barring the public from the jury selection proceedings, the Court made reasonable efforts to ensure that members of the public were able to view the jury selection proceedings in an extension of the courtroom—of which Ms. Rodriguez was made aware—despite the limited seating capacity in the courtroom given the size of the jury pool. Because there was no courtroom closure or exclusion of the public from the jury selection proceedings in this case, Defendant Gutierrez-Calderon's Sixth Amendment right to a public trial was not violated. Defendant's Motion for a New Trial will therefore be denied.

### 4. Triviality of the Alleged Courtroom Closure

Although the Court finds that no courtroom closure occurred in this case, the Court will briefly address the Government's argument that—assuming a courtroom closure did occur—any such closure was trivial.

As noted above, various courts have determined that—despite the structural nature of the right to a public trial—not every courtroom closure rises to a level implicating a defendant's Sixth Amendment rights. *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009); *United States v. Patton*, 502 F. App'x 139, 142 (3d Cir. 2012); *United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007). In *Patton*, 502 F. App'x 139, a Third Circuit panel considered a claim by habeas petitioners that their Sixth Amendment rights to a public trial were violated by an alleged courtroom closure. *Id.* at 140-41. Noting the considerations laid out by the Supreme Court in *Waller v. Georgia*, 467 U.S. 39 (1984), the *Patton* Court observed that a courtroom closure does not offend the Sixth Amendment and is therefore trivial where the closure does not jeopardize the values of "(1) ensur[ing] a fair trial, (2) remind[ing] the government and the judge of their responsibility to the

accused and importance of their functions, (3) encourag[ing] witnesses to come forward, and (4) discourag[ing] perjury[.]" *Id.* at 141-42. The *Patton* Court also recognized the "actions of the [trial] court and their effect on the conduct of the trial"—including the trial judge's awareness of a closure—as important considerations with respect to the determination whether a closure was trivial. *Id.* at 142.[23]

Assuming without finding that a courtroom closure occurred because the courtroom was filled to capacity with prospective jurors, the Court finds that any such closure was trivial. As described above, the Court took proactive steps in this case to accommodate the public by broadcasting the *voir dire* proceedings in an overflow room that was established to serve as an extension of the courtroom. Thus, an option for viewing the jury selection proceedings remained available despite the practical limits on available seating in the courtroom due to the size of the jury pool. Further, the Court was not informed at any point that any person felt as though (s)he had been excluded from the jury selection proceedings.

Under these circumstances, if a courtroom "closure" occurred in some technical sense, the closure did not infringe on the values furthered by the Sixth Amendment's guarantee of the right to a public trial. There is no suggestion that the alleged closure impacted the fairness of the trial or otherwise implicated the concerns identified by the Supreme Court in *Waller*. In other words, "the actions of the court and the effect that they had on the conduct of the trial" did not deprive

---

[23] This is not to suggest, however, that inadvertence necessarily renders a courtroom closure trivial where the closure resulted directly from the actions of a trial judge. *See United States v. Greene*, 431 F. App'x 191, 196 (3d Cir. 2011) ("Mere inadvertence does not invariably preclude the finding of a Sixth Amendment violation.") (citing *Owens v. United States,* 483 F.3d 48, 63 (1st Cir. 2007)); *see also Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004) (although the record suggested that a courtroom closure "was inadvertent and merely a result of [the] trial court['s] . . . honorable desire to 'get it done'[], nevertheless, the judge's devotion to work is not an interest sufficient to overcome Walton's constitutional guarantee of a public trial").

Defendant Gutierrez-Calderon "of the protections conferred by the Sixth Amendment." *Gupta*, 699 F.3d at 688. To the contrary, the Court made proactive efforts to ensure that the public could view the jury selection proceedings despite the practical limitations on seating space in the courtroom. Accordingly, even if the Court were to find that a courtroom closure occurred, Defendant's Motion for a New Trial would still be denied because the closure under the circumstances here was trivial in that it did not implicate Defendant's Sixth Amendment right to a public trial.

### III. CONCLUSION

For the reasons discussed above, the Court will deny Defendant Gutierrez-Calderon's Motion for a New Trial. Specifically, Defendant's Motion will be denied because: (1) Defendant's Motion was untimely under Federal Rule of Criminal Procedure 33; (2) even if Defendant's Motion was timely, Defendant's Sixth Amendment right to a public trial was not violated because no courtroom closure occurred in this case; and (3) even if a courtroom closure occurred, Defendant's Sixth Amendment right to a public trial was not violated because any such closure was trivial.

An appropriate Order accompanies this Memorandum Opinion.

Date:   August 16, 2019                               _____/s/_____
                                                      WILMA A. LEWIS
                                                      Chief Judge